**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**Case No. 03-2033C**
**(Judge Firestone)**

---

**COMMERCIAL CASUALTY INSURANCE COMPANY OF GEORGIA,**

**Plaintiff,**

**v.**

**THE UNITED STATES**

**Defendant.**

---

**Brief of Amicus Curiae The Surety Association of America**
**In Opposition to Defendant's Motion to Dismiss or for Summary Judgment**

---

Edward G. Gallagher
Wickwire Gavin, P.C.
8100 Boone Boulevard, 7th Floor
Vienna, VA 22182
Tel: (703) 790-8750
Fax: (703) 448-1801

Attorney of Record for
The Surety Association of America

## Table of Contents

**Statement of Interest** ........ 1

**Statement of Facts** ........ 1

**Statement of the Case** ........ 2

**Argument** ........ 3

**I. *Blue Fox* is Consistent with Tucker Act Jurisdiction for Suit by a Payment Bond Surety** ........ 4

**II. The Insurance Company of the West Decisions Are Consistent With Tucker Act Jurisdiction For Suits by a Payment Bond Surety** ........ 6

**III. A Payment Bond Surety Can Enforce the Superior Equities of the Subcontractors** ........ 10

**IV. The Unpaid Rogers Electric Claim Does Not Affect this Court's Jurisdiction** ........ 13

**V. There is an Alternative Basis for Jurisdiction that Does Not Depend on Subrogation** ........ 14

**VI. Logic, Equity and Public Policy Support Rejection of the Government's Arguments** ........ 15

**VII. Two Alternative Theories Also Provide Jurisdiction in This Case** ........ 17

**Conclusion** ........ 18

# Table of Authorities

## Cases

*Active Fire Sprinkler Corp. v. United States Postal Service*, 811 F.2d 747 (2nd Cir. 1987)......... 12

*Argonaut Insurance Co. v. United States*, 193 Ct. Cl. 483, 434 F.2d 1362 (1970)........................ 4

*Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed. Cir. 1985)............................. passim

*Dept. of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 119 S.Ct. 687, 142 L. Ed. 2d 718 (1999).. 4, 5, 6, 11

*Fireman's Fund Insurance Co. v. United States*, 190 Ct.Cl. 804, 421 F.2d 706 (1970)................ 4

*Great American Insurance Co. v. United States*, 203 Ct.Cl. 592, 492 F.2d 821 (1974)................ 4

*Hartford Fire Insurance Co. v. United States*, 40 Fed. Cl. 520 (1998)........................................ 4

*Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908)........................................................................................................................ 10, 11

*Home Indemnity Co. v. United States*, 180 Ct. Cl. 173, 376 F.2d 890 (1967)............................... 4

*Insurance Company of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001)............. passim

*Insurance Company of the West v. United States*, 55 Fed. Cl. 529, 534-538 (2003).................. 10

*Integon Indemnity Corp. v. United States*, 12 Cl.Ct. 115 (1987).................................................. 4

*International Fidelity Insurance Co. v. United States*, 25 Cl. Ct. 469 (1992)............................... 4

*International Fidelity Insurance Company v. United States*, 41 Fed.Cl. 706, 711 (1998)............ 4

*Kennedy Electric Co. Inc. v. United States Postal Service*, 508 F.2d 954 (10th Cir. 1974).......... 11

*Lamb Engineering & Construction Co. v. United States*, 58 Fed. Cl. 106 (2003)...................... 12

*North Denver Bank v. United States*, 193 Ct. Cl. 225, 432 F.2d 466 (1970).................. 12, 13, 14

*Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962).... passim

*Prairie State National Bank v. United States*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896) 11

*Reliance Insurance Co. v. United States*, 15 Cl.Ct. 62 (1988)..................................................... 4

*United Electric Corp. v. United States*, 227 Ct.Cl. 236, 647 F.2d 1082 (1981)............... 3, 5, 9, 11

*United Pacific Insurance Co. v. United States*, 16 Cl. Ct. 555 (1989).......................................... 4

*United States Fidelity & Guaranty Co. v. United States*, 16 Cl.Ct. 541 (1989) ............................ 4

*United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973) ........................................................................................................................ passim

*United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949) 6

*United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947).... 8, 9, 11

*Wright v. United States Postal Service*, 29 F.3d 1426 (9th Cir. 1994) ......................................... 12

**Statutes**

Administrative Procedures Act ("APA"), at 5 U.S.C. §702 .......................................................... 4

FAR §28.106-7 ............................................................................................................... 2, 15

FAR §52.232-5 (48 C.F.R. §52.232-5) ........................................................................... 12

Miller Act, 40 U.S.C. §§3131, et seq. ............................................................................... 1

Prompt Payment Act, 31 U.S.C. §3903(b)(1)(B) ............................................................ 12

Tucker Act, 28 U.S.C. §1491 ..................................................................................... 1, 2, 5

## Statement of Interest

The Surety Association of America ("SAA") is a voluntary, non-profit trade association with approximately 500 member companies. Collectively, these companies write the overwhelming majority of the performance and payment bonds required by the Miller Act, 40 U.S.C. §§3131, et seq., for public works projects of the United States. SAA collects statistics on premiums and losses for fidelity and surety insurance and files those statistics with the insurance departments of all 50 states.

Like other insurance products, the cost of surety bonds ultimately depends on the losses sureties incur. If sureties cannot assure that contract funds are used to pay contract obligations, their losses, and hence the cost of bonds, will increase. The United States argues that the Tucker Act, 28 U.S.C. §1491, does not grant this Court jurisdiction over a suit by a payment bond surety to recover judgment for contract funds held by the United States. If successful, this argument would change well-established law upon which sureties have relied in providing Miller Act bonds and in computing premiums for such bonds.

The outcome of this case will have a significant impact on Miller Act sureties, and in the long term on the availability and cost of bonds on federal construction projects. SAA and its members who are not parties to this case have a significant interest in the Court's decision on the issues raised by the Government's Motion to Dismiss or in the Alternative for Summary Judgment.

## Statement of Facts

The parties agree that the Department of the Navy (Navy or Government) contracted with F.A.S. Development Company, Inc. (F.A.S.) and that the work required by the contract is complete and the Navy is holding an admitted contract balance of $48,425. The only claimant to

this contract balance is the Miller Act surety on the project, plaintiff Commercial Casualty Insurance Company of Georgia (Commercial Casualty). The Government asserts no claim of its own to the contract balance.

There were two unpaid subcontractors on the project. Commercial Casualty paid the claim of FCX Systems, Inc. (FCX) in the amount of $25,644. Commercial Casualty denied the claim of Lin R. Rogers Electrical Contractors, Inc. (Rogers Electric) in the amount of $11,565 because it was barred by the one year suit limitation provision of the Miller Act.

Commercial Casualty gave the Navy timely notice that F.A.S. failed to pay its subcontractors and requested that the Navy not disburse the contract funds to anyone other than Commercial Casualty or the unpaid subcontractors. Commercial Casualty also invoked FAR §28.106-7 and provided the Navy with a hold harmless agreement and a consent by F.A.S. to release of the contract balance to Commercial Casualty.

**Statement of the Case**

Commercial Casualty filed the Complaint in this action to recover the unpaid contract balance. The Government moved to dismiss the Complaint on the ground that this Court does not have jurisdiction under the Tucker Act, 28 U.S.C. §1491, to hear any suit by a payment bond surety because a payment bond surety is subrogated to only the rights of the subcontractors and suppliers whom it paid, and they have no rights under the Tucker Act. In the alternative, the Government moved for summary judgment on the ground that a payment bond surety cannot assert its subrogation rights as long as a subcontractor is unpaid even if payment of the subcontractor is not a legal obligation of the surety. SAA files this Brief primarily to address the jurisdictional issue but also to suggest that the Court can enter a judgment in this matter that fully protects the subcontractors while also doing justice to Commercial Casualty and the Navy.

## Argument

This Court, of course, is bound to follow precedent of the Court of Appeals for the Federal Circuit and the Court of Claims. Those Courts repeatedly held that the Tucker Act grants jurisdiction over a suit by a payment bond surety to recover contract funds that the Government owes under the bonded contract or that the Government wrongfully paid after notice from the surety.

In *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973), (*"USF&G")* the court explained why a payment bond surety can sue the United States while unpaid subcontractors and suppliers cannot:

> The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the defendant.

(475 F.2d 1382).

*Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed. Cir. 1985) involved a payment bond surety seeking to recover contract funds wrongfully paid by the Government. The Court noted that although other theories were possible, the traditional means for the surety to assert its claim was equitable subrogation and then quoted the above language from *USF&G* in rejecting the Government's contention "that a surety is similar to a subcontractor, who is not in privity of contract with the Government." (775 F.2d 1160).

In *United Electric Corp. v. United States*, 227 Ct.Cl. 236, 647 F.2d 1082, 1086 (1981), the Court reiterated that subcontractors cannot sue the United States and explained the surety's standing to sue under the Tucker Act as follows:

> [W]hile the surety gains equitable rights from its subrogation to the subcontractors' claims, its standing to sue (its ability to enforce those rights and others) comes from the fact that it is also subrogated to, and stands in the shoes of,

> the contractor, an entity which is clearly in privity of contract with the Government.

*International Fidelity Insurance Company v. United States*, 41 Fed.Cl. 706, 711 (1998) stated:

> It is settled law that the Tucker Act, coupled with the doctrine of equitable subrogation, provides subject matter jurisdiction to the court to determine a surety's claim against the government stemming from the alleged improper disbursement of contract funds.

Other cases allowing payment bond sureties to sue for contract funds held, or wrongfully paid, by the United States include *Home Indemnity Co. v. United States*, 180 Ct. Cl. 173, 376 F.2d 890 (1967); *Great American Insurance Co. v. United States*, 203 Ct.Cl. 592, 492 F.2d 821 (1974); *Fireman's Fund Insurance Co. v. United States*, 190 Ct.Cl. 804, 421 F.2d 706 (1970); *Argonaut Insurance Co. v. United States*, 193 Ct. Cl. 483, 434 F.2d 1362 (1970); *Hartford Fire Insurance Co. v. United States*, 40 Fed. Cl. 520 (1998); *International Fidelity Insurance Co. v. United States*, 25 Cl. Ct. 469 (1992); *United Pacific Insurance Co. v. United States*, 16 Cl. Ct. 555 (1989); *United States Fidelity & Guaranty Co. v. United States*, 16 Cl.Ct. 541 (1989); *Reliance Insurance Co. v. United States*, 15 Cl.Ct. 62 (1988); and *Integon Indemnity Corp. v. United States*, 12 Cl.Ct. 115 (1987).

The Government argues in the instant case that the decisions discussed above, and the numerous similar cases allowing suit by a payment bond surety, were overruled, *sub silencio*, by *Dept. of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 119 S.Ct. 687, 142 L. Ed. 2d 718 (1999) and *Insurance Company of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001).

## I. *Blue Fox* is Consistent with Tucker Act Jurisdiction for Suit by a Payment Bond Surety

*Blue Fox* involved neither a surety nor the Tucker Act. The Court held that the Administrative Procedures Act ("APA"), at 5 U.S.C. §702, did not waive the Government's sovereign immunity for suit by an unpaid subcontractor. The APA waives sovereign immunity

for suits other than for money damages. The Court reasoned that money damages included compensatory or substitute relief, and the unpaid subcontractor was seeking money to compensate or substitute for the loss occasioned by the prime contractor's default. The Court stated:

> We accordingly hold that the sort of equitable lien sought by respondent here constitutes a claim for “money damages”; its goal is to seize or attach money in the hands of the Government as compensation for the loss resulting from the default of the prime contractor. As a form of substitute and not specific relief, respondent’s action to enforce an equitable lien falls outside of § 702’s waiver of sovereign immunity.

(525 U.S. 263, 119 S.Ct. 692).

*Blue Fox* recognized that "money damages," although excluded from the sovereign immunity waiver of the APA, are within the waiver of the Tucker Act. The Court stated, "Congress, of course, has waived its [the United States’] immunity for a wide range of suits, including those that seek traditional money damages. Examples are . . . the Tucker Act, 28 U.S.C. §1491." (525 U.S. 260, 119 S.Ct. 690). The result in *Blue Fox*, of course, is consistent with longstanding Federal Circuit and Court of Claims authority, such as *USF&G* and *United Electric*, supra., holding that subcontractors cannot sue the United States.

It is important to remember that *Blue Fox* dealt with sovereign immunity not the merits of an equitable claim or any right to payment. While the Court held that the APA did not waive sovereign immunity for liens on Government funds to recoup losses, it did not question, and had no reason to question, that such liens existed and could be enforced if there were an applicable sovereign immunity waiver.

## II. The Insurance Company of the West Decisions Are Consistent With Tucker Act Jurisdiction For Suits by a Payment Bond Surety

The Government took the position that *Blue Fox* meant sovereign immunity barred all Tucker Act suits by sureties other than sureties that had signed takeover agreements with the United States. The test case for this argument was a claim filed by Insurance Company of the West ("ICW") to recover payments made to the contractor after ICW had requested, and the Government had agreed, that all future payments be mailed to ICW's address. ICW financed the contractor's completion of the work and had only a performance bond loss. There were several earlier cases granting judgment to the surety on almost identical facts, and the only real issue in the case was the effect of *Blue Fox*.

*Insurance Company of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001) ("*ICW")* rejected the Government's arguments and held that there was a sovereign immunity waiver and Tucker Act jurisdiction for ICW's suit. First, the Court noted that *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949) established that the Anti-Assignment Acts do not bar subrogation claims and that a subrogee, standing in the shoes of someone for whose claim sovereign immunity has been waived, has the benefit of the waiver unless the waiver was expressly limited to the original claimant. The *ICW* Court held that the Tucker Act waiver was for claims, not claimants, and extended to a surety subrogated to the contractor's rights.

In *ICW* the Government also argued that under the doctrine of subrogation, the surety was subrogated only to the rights of the creditor it paid. In the context of a Miller Act performance bond, that creditor is the United States, and so the Government argued that the surety stood in the shoes of the United States, not those of the contractor. The Court rejected that

argument based on *Balboa Insurance Co. v. United States*, supra., and *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). The Court in *ICW* stated:

> The government also argues that even if sovereign immunity does not bar ICW's claim, this court's precedents have misapplied the doctrine of subrogation. The government cites *Pearlman* for the proposition that "a surety who pays the debt of another is entitled to all the rights of the person he paid," *Pearlman*, 371 U.S. at 137, 83 S.Ct. 232, and it argues that a surety that completes performance of a government contract would therefore step into the shoes of the government, not the contractor. We disagree. A contractor essentially owes the government a debt of performance, and a surety who completes performance pays the debt. We believe that *Balboa* correctly states the law of equitable subrogation. *Pearlman* stands for the proposition that the subrogee steps into the shoes both of the contractor against the government and the government against the contractor.

(Footnote 3, 243 F.3d 1375).

The Court was clearly correct in its understanding of *Pearlman* and *Balboa*. Indeed, *Pearlman* concluded:

> We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.

(371 U.S. 141, 83 S.Ct. 237).

If the contractor had completed the work and paid its bills, it would have been entitled to the contract funds, and the surety that paid the bills is subrogated to the contractor's rights, as well as to the rights of the Government and the persons paid. *Balboa*, of course, says the same thing. In rejecting the Government's contention that the surety was in the same position as a subcontractor or supplier, the *Balboa* Court stated, "The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States." (775 F.2d 1161 quoting from *USF&G*, supra., 475 F.2d at 1382). For present purposes,

it is crucial to note that both *Balboa* and *Pearlman* were payment bond cases. That is, the sureties' losses were only under their payment bonds. No performance bonds or performance bond losses were involved.

With that background, *ICW*'s *dicta* addressing the rights of payment bond sureties is clearly inconsistent with the Court's actual holding. The Court stated at 243 F.3d 1371:

> It is well-established that a surety who discharges a contractor's obligation to pay subcontractors is subrogated only to the rights of the subcontractor. Such a surety does not step into the shoes of the contractor and has no enforceable rights against the government.

This is *dicta* because there was no payment bond surety before the Court and no need to address the rights of a payment bond surety. The Court was demonstrably incorrect in terming its statement as "well-established." On the contrary, it conflicts with the numerous cases allowing payment bond sureties to sue the United States, with the very cases, *Balboa* and *Pearlman*, that the *ICW* Court later relied on to define the scope of the surety's subrogation rights, and with the holdings of *Balboa*, *USF&G* and other cases discussed above in which payment bond sureties were explicitly held to be subrogated to the rights of the contractor as well as to the rights of the subcontractors and suppliers.

The only authority cited by *ICW* in support of its statement was *United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). The only issue in *Munsey Trust* was the Government's right of setoff. Neither sovereign immunity nor standing to sue was disputed. Indeed, Munsey Trust Company was the receiver for the contractor and sued in the contractor's name, albeit for the benefit of the surety. The issue was whether the Government could setoff a debt owed by the contractor on another job against the contract funds the Government owed on the bonded jobs. The Court held that the right of setoff prevailed. In *Pearlman* the Court explicitly limited *Munsey Trust* to the setoff issue. *Pearlman* stated:

> The point at issue in that case [*Munsey Trust*] was whether the United States while holding a fund like the one in this case could offset against the contractor a claim bearing no relationship to the contractor's claim there at issue. We held that the Government could exercise the well-established common-law right of debtors to offset claims of their own against their creditors. This was all we held."

(371 U.S. 140, 83 S.Ct. 237)

If *Munsey Trust* is limited to setoff, it has no effect on the payment bond surety's ability to sue the United States. The Court in *Munsey Trust*, however, stated, "But nothing is more clear than that laborers and materialmen do not have <u>enforceable</u> rights against the United States for their compensation." (332 U.S. 241, 67 S.Ct. 1602, Emphasis supplied). In *USF&*G and *United Electric*, *supra*., the Court of Claims rejected attempts by subcontractors to sue the United States for contract funds, and in so holding considered the tension between *Munsey Trust* and the statement in *Pearlman* that the surety is subrogated to the right of the laborers and materialmen to be paid. As the Court stated in *USF&G*:

> It is a short step from *Pearlman* to infer that if the subcontractors have rights to which the surety may be subrogated, then the subcontractors should be able to assert their rights directly, which is in complete conflict with the language in *Munsey*, as recognized by Justice Clark's concurring opinion in *Pearlman*.
>
> The dilemma may be resolved in a number of ways, but the most apparent might be by noting that the Court in *Pearlman* stated that the surety was entitled to the benefit of *all* the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid.

(475 F.2d 1382, Emphasis by the Court).

Thus, the Court of Claims rejected the reading of *Munsey Trust* upon which the *dicta* in *ICW* is based. The fallacy in the Government's reasoning in the instant case, and in the *dicta* in *ICW*, is the assumption that a payment bond surety is subrogated to only the rights of the subcontractors and suppliers. As is discussed above, the payment bond surety is subrogated to the rights of the contractor as well as those of the subcontractors and suppliers. In *ICW* the Court

did not purport to reinterpret *Pearlman*, *Balboa*, *USF&G*, or the numerous cases allowing payment bond sureties to sue under the Tucker Act. It had no reason to consider the subrogation rights of a payment bond surety at all.

The Federal Circuit remanded ICW's case to the Court of Federal Claims, and the Government argued on remand that the Federal Circuit's statement on the subrogation rights of a payment bond surety nullified the authority cited by ICW and limited the scope of sureties' equitable subrogation claims. In *Insurance Company of the West v. United States*, 55 Fed. Cl. 529, 534-538 (2003), Judge Miller discussed this contention in light of prior decisions and concluded, "Read against the foregoing precedent, the dicta in *West II* do not define the scope of a surety's rights under the doctrine of equitable subrogation." (55 Fed. Cl. 538).

The Federal Circuit's *dicta* on the subrogation rights of payment bond sureties was inconsistent with the actual holding in the case, contrary to long standing precedent which the Court did not discuss or purport to overrule, and contrary to the holding of *Pearlman*. SAA respectfully suggests that this Court, like Judge Miller in her decision after the ICW case was remanded, should find that the *dicta* in *ICW* does not define the scope of a payment bond surety's subrogation rights.

## III. A Payment Bond Surety Can Enforce the Superior Equities of the Subcontractors

Although sovereign immunity bars unpaid subcontractors from suing the United States to enforce their equitable claim to the contract funds earned by their work, their equities still exist and are superior to any claim by the defaulting contractor. *Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), held:

> It [the surety] paid the laborers and materialmen, and thus released the contractor from his obligations to them, and to the same extent released the government from all equitable obligations to see that the laborers and supplymen were paid.

See also, *USF&G*, 475 F.2d at 1382 ("The subcontractors do possess equitable rights to the retained funds vis-a-vis other claimants to the money"); and *United Electric*, 647 F.2d at 1086 ("But the existence of equitable rights in subcontractors (as well as other laborers and materialmen) does not mean that they, too, can sue the United States . . .").

When the surety pays the subcontractors, it is subrogated to their superior equities and can claim the contract balances in preference to the defaulting contractor or anyone claiming through the contractor. At least since *Henningsen*, payment bond sureties have been held to have rights to contract funds superior to defaulting contractors' competing claims. In *Pearlman*, *supra.*, the Court rejected the argument that *Munsey Trust* changed the surety's equitable rights and stated:

> But the equitable rights of a surety declared in the Prairie Bank case as to sureties who complete performance of a contract were expressly recognized and approved in Munsey, and the Henningsen rule as to sureties who had not completed the contract but had paid laborers was not mentioned. Henningsen was not even cited in the Munsey opinion. We hold that Munsey left the rule in Prairie Bank and Henningsen undisturbed. We cannot say that such a firmly established rule was so casually overruled.

In *Blue Fox* the Court thought that *Prairie State Bank*[1], *Henningsen*, and *Pearlman* were not authority for a sovereign immunity waiver, but it did not question that they correctly stated the relative equities of the contesting claimants. The Court did not overrule the three cases. It distinguished them as not addressing the issue before the Court – whether sovereign immunity barred Blue Fox's suit.

If sovereign immunity is waived, unpaid subcontractors can sue the Government for payment out of contract funds. Congress waived sovereign immunity for the United States Postal Service by authorizing it to sue and be sued, and *Kennedy Electric Co. Inc. v. United States Postal Service*, 508 F.2d 954 (10th Cir. 1974); *Active Fire Sprinkler Corp. v. United States*

[1] *Prairie State National Bank v. United States*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896).

*Postal Service*, 811 F.2d 747 (2nd Cir. 1987); and *Wright v. United States Postal Service*, 29 F.3d 1426 (9th Cir. 1994) all allowed subcontractors to sue the Postal Service for contract funds.

The United States requires its construction contractors to pay the persons who furnish labor and material for use in performance of the contract. These persons can sue the contractor and its surety on the Miller Act payment bond, but the obligee of the bond is the United States. The contractor promises the United States that the subcontractors, suppliers and laborers will be paid. In addition to the promise in the payment bond, the clause for Payments under Fixed Price Construction Contracts required by FAR §52.232-5 (48 C.F.R. §52.232-5) forbids payment to a contractor unless the contractor certifies in its request for payment that:

> All payments due to subcontractors and suppliers from previous payments received under the contract have been made, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code.

This contract clause implements the certification provision of the Prompt Payment Act, 31 U.S.C. §3903(b)(1)(B). A contractor that falsely certifies payment to its subcontractors and suppliers violates the payments clause and is subject to termination for default. *Lamb Engineering & Construction Co. v. United States*, 58 Fed. Cl. 106 (2003).

Finally, the Government has the right to use contract funds to pay the subcontractors and suppliers directly if the contractor fails to pay them. Indeed, the courts have urged the Government to make such payments when that is the only way to get the funds to the subcontractors and suppliers. *USF&G*, supra., at 475 F.2d 1383; *North Denver Bank v. United States*, 193 Ct. Cl. 225, 432 F.2d 466 (1970). In *Lamb Engineering & Construction Co. v. United States*, supra., the Court, citing *Pearlman*, agreed with the Government that it could make

such payments ("As the defendant correctly points out, however, the government has the right to use retained funds to pay subcontractors."), 58 Fed. Cl. at 113.

When the surety pays the subcontractors and suppliers, therefore, it satisfies the contractor's obligation to them, it satisfies the contractor's obligation to the Government, and it satisfies the Government's equitable duty to the subcontractors and suppliers. Thus, the Court in *Pearlman* held that the payment bond surety was subrogated to the right of the Government to use the contract fund to pay subcontractors, the right of the subcontractors to be paid out of the fund, and the right of the contractor to receive the contract fund once the subcontractors were paid and the work completed. (371 U.S. 141, 83 S.Ct. 237).

## IV. The Unpaid Rogers Electric Claim Does Not Affect this Court's Jurisdiction

In a series of cases, the Court of Claims exercised Tucker Act jurisdiction over the payment bond surety's suit even though there were unpaid subcontractors. The Court recognized that the surety was not entitled, under a subrogation theory, to actual payment of the contract funds in competition with the subcontractors, but it allowed the surety's suit to go forward and fashioned a judgment that protected the subcontractors.

In *North Denver Bank v. United States*, 193 Ct.Cl. 225, 432 F.2d 466 (1970) the surety paid the penalty of its payment bond ($21,500) but that left unpaid subcontractor claims of $15,435.77. The Government was holding a contract balance of $34,080.50. The Court entered judgment for the surety in the amount of $34,080.50 but conditioned the judgment on the surety paying the $15,435.77 still owed to the claimants. The Court's Order stated:

> Provided, however, That the recovery by Great American Insurance Company is conditioned upon the filing with the Clerk of the Court, within 30 days after the date on which judgment is entered, of receipts from all the claimants listed in finding 41, showing payment in full by Great American Insurance Company of their respective claims against Van Winkle Construction Company.

In *USF&G*, supra., the conditional judgment would not work because the balance owed the subcontractors exceeded $40,000 while the admitted contract fund was only 4,400. Instead, the Court recommended:

> In an effort to dispose of this problem once and for all, this court recommends that the Navy simply pay the contesting laborers and materialmen according to the pro rata division employed by the Massachusetts District Court or file an action in interpleader in that or another appropriate court . . . in order to see to it that the Government does not retain possession of funds to which the subcontractors have an equitable claim.

(475 F.2d at 1383, citations omitted).

In the instant case, either approach would work. The Court could enter a judgment for Commercial Casualty in the amount that the Navy admits it holds, $48,425, or the total of the two claims, $37,209, but condition the judgment on Commercial Casualty demonstrating that it has paid Rogers Electric $11,565. Or, the Navy could voluntarily pay Rogers Electric $11,565 and thereby remove the barrier to a judgment for Commercial Casualty in the amount of the $25,644 it paid FCX Systems.

The existence of an unpaid subcontractor is relevant to the surety's right to recover as subrogee of the subcontractors it paid, but not to the court's jurisdiction under the Tucker Act. Just as in *USF&G* and *North Denver Bank*, the Court has jurisdiction to decide the merits of the case, but one aspect of those merits is the fact that Rogers Electric has not been paid.

**V. There is an Alternative Basis for Jurisdiction that Does Not Depend on Subrogation**

SAA does not argue with the proposition that a surety cannot use its right of subrogation to compete with the class of persons protected by its bond. In the instant case, however, Commercial Casualty has an alternative basis to sue, and collect from, the Navy. The Tucker Act provides jurisdiction in this Court for suits founded upon regulations. Commercial

Casualty's Complaint alleges that the Navy refused to make payment to Commercial Casualty in violation of FAR §28.106-7, which states, in part:

> (b) If after completion of the contract work, the Government receives written notice from the surety regarding the contractor's failure to meet its obligation to its subcontractors or suppliers, the contracting officer shall withhold final payment. However, the surety must agree to hold the Government harmless from any liability resulting from withholding the final payment. The contracting officer will authorize final payment upon agreement between the contractor and surety or upon a judicial determination of the rights of the parties.

The only prerequisites to payment under the regulation are: (1) notice that the contractor failed to pay its subcontractors, (2) a hold harmless agreement, and (3) agreement between the contractor and surety. There is no requirement that the surety have paid the subcontractors and suppliers before it is entitled to release of the withheld contract funds under §28.106-7(b). Commercial Casualty clearly complied with each condition. It repeatedly notified the Navy that F.A.S. had not paid the subcontractors, it provided a hold harmless agreement, and it provided an assignment executed by F.A.S. directing the Navy to pay the funds to Commercial Casualty.

## VI. Logic, Equity and Public Policy Support Rejection of the Government's Arguments

The Government argues that the bond is to protect the Government not the surety, and that the surety received a premium to take the risk that the contractor would default. That premium, however, was based on loss experience, and those losses reflected the long-standing case law that allows the surety to assure that contract funds are not dissipated. For decades, a Miller Act surety has been able to notify the Government that the contractor defaulted in payments to its subcontractors and suppliers, and the Government then is responsible for withholding the final contract payment.[2]

[2] If the work is physically complete, the duty to withhold is absolute. If the work is not complete, the contracting officer can consider the Government's interest in having the work completed along with the surety's interest in preserving the contract funds. *Balboa,* supra.

The surety takes the risk that the cost to complete the work and pay the persons who provided labor and material for use in performance of the contract will exceed the contract price. The surety does not assume the risk that the Government will retain the work and the money appropriated to pay for it. Under the Navy's theory advanced in this case, the contractor could not sue for the remaining contract funds because it defaulted by not paying its subcontractors and suppliers. The subcontractors and suppliers could not sue because the United States has not waived sovereign immunity for such a suit. And, the surety also could not sue because there would be no Tucker Act jurisdiction. The Government could simply keep the money. This result is not some imaginary "the sky is falling" argument dreamed up by counsel. It is the Navy's position in this case. The only claimant to the contract funds is Commercial Casualty, and if the Court were to agree with the Government and dismiss this case, the Navy apparently plans to keep the money and the contract work.

In its jurisdictional argument, the Government seeks to upset a fair and reasonable allocation of rights and responsibilities developed by the Courts and in place for many years. The contractor is obligated to pay for the labor and material used on the project. If he does not, he loses his right to receive additional contract funds. The surety, by paying for the labor and material, becomes entitled to the contract funds. The Government, however, is protected because its duty to withhold the funds is conditioned on the surety notifying it of the contractor’s default and requesting that the funds be retained.

The long-standing rule is that the payment bond surety can protect contract funds by giving the Government notice of the contractor's default. This rule serves the public interest in assuring that contract funds are used to pay contract obligations, but without the ability to sue if the Government breaches its obligation the surety cannot enforce the rule. The Government

could pay the wrong claimant, or even keep the money for itself, with impunity. Tucker Act jurisdiction for suits by payment bond sureties is essential to protect the contract funds and the public interest.

**VII. Two Alternative Theories Also Provide Jurisdiction in This Case**

SAA respectfully argues that the Miller Act bonds are three-party contracts, the United States, as Obligee on the bonds, is a party to the contracts, and suit under the Tucker Act can be brought by the surety directly as a party to a contract with the United States. SAA recognizes that decisions of the Court of Appeals for the Federal Circuit hold otherwise, and that this Court is bound by those decisions. If this matter is appealed, however, to a Court that is free to examine those decisions, the surety can argue that the cases are wrongly decided and that the United States is in contractual privity with the Miller Act surety.

In addition, the legislative history of the Tucker Act shows that it was intended to relieve Congress of the burden of a multitude of private bills seeking relief for legitimate, questionable and invalid debts allegedly owed by the United States. The Court of Claims was established first to provide an advisory opinion and, in the Tucker Act, to render a judgment on all such claims. The intent of the legislation was to make the Court's jurisdiction extremely broad, and the current, narrow reading of the Act is in conflict with that intent and, specifically, disregards the grant of jurisdiction over claims for "liquidated or unliquidated damages in cases not sounding in tort." Again, SAA recognizes that this Court is bound by precedent and that an argument for a broader reading of the Tucker Act should be made on appeal.

**Conclusion**

SAA respectfully suggests that the Tucker Act grants this Court jurisdiction over Commercial Casualty's suit for the contract fund held by the Navy. The Motion to Dismiss or in the Alternative for Summary Judgment should be denied.

Dated: November 10, 2005.

__/s/_*Edward G. Gallagher*__

Edward G. Gallagher
Wickwire Gavin, P.C.
8100 Boone Blvd., Suite 700
Vienna, VA 22182
Tel: (703) 790-8750
Fax: (703) 448-1801

Attorney for Amicus Curiae
The Surety Association of America

CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2005, a copy of the foregoing Brief of Amicus Curiae The Surety Association of America in Opposition to Defendant's Motion to Dismiss or for Summary Judgment was filed electronically. I understand that notice of this filing will be sent to counsel for all parties by the Court's electronic filing system. Parties may access a copy of this filing via the Court's electronic filing system.

/s/ *Edward G. Gallagher*

Edward G. Gallagher